Keith D. Wilkey,                    :    Case No. 1:07-cv-160
                                    :
        Plaintiff,                  :
                                    :
vs.                                 :
                                    :
Greg Hull, Esq. and Millikin &      :
Fitton L.P.A.,                      :
                                    :
        Defendants.                 :

**ORDER**

Before the Court is Defendants' motion for summary judgment.
(Doc. 67)  Plaintiff opposes the motion (Doc. 70) and Defendants
have replied. (Doc. 75)

Both parties filed voluminous pleadings along with a large
number of exhibits.[1]  The Court will not attempt to summarize all
of the material in the record, but will discuss the facts and
arguments presented as they are relevant to the dispositive
issues raised in the motion.

**FACTUAL BACKGROUND**

Dr. Keith Wilkey is an orthopedic surgeon, formerly on the
professional staff of the McCullough-Hyde Memorial Hospital in
Oxford, Ohio.  The hospital's Medical Executive Committee ("MEC")

---

[1] Plaintiff's opposition memorandum does not comply with
Local Rule 7.2(a)(3), requiring any memorandum longer than 20
pages to include a table of contents and a "succinct, clear and
accurate" summary of the memorandum.

summarily suspended his staff privileges on February 5, 2003 based upon the recommendation of the Bylaws and Credentials Committee. The latter committee met on February 4 to discuss questions pertaining to two of Dr. Wilkey's recent surgeries. The committee sought an external physician's review of those cases, and noted concerns about Dr. Wilkey's surgical patient selection, and his "disruptive behavior involving reckless handling of equipment and extreme anger and frustration." (Exhibit G, Minutes of February 4 meeting.)[2] The committee recommended a summary suspension and further investigation, which the MEC imposed the next day. The hospital requested the external review on February 6, using a third-party referral source to locate a physician. (Exhibit M)

An Ad Hoc Fact-Finding committee of hospital physicians met with Wilkey on February 12. The summary of this meeting states that the main point of discussion was the tone and tempo in the operating room. (Exhibit N) The Ad Hoc committee recommended that the summary suspension be continued based upon the external reviewer's initial comments on the two surgical cases, staff perceptions about Wilkey's admitted problem in controlling his frustration, and concerns about his truthfulness. The initial external review of the two surgical cases was done by Dr.

---

[2] Unless otherwise stated, the lettered exhibits referenced in this Order are those attached to Defendant's summary judgment motion.

Seasons, who is not affiliated with the hospital.

In a subsequent meeting of the Ad Hoc Committee and Wilkey on February 26, Wilkey questioned Dr. Seasons' qualifications, wanting assurances that he was an active spine surgeon. Wilkey disagreed with Seasons' negative comments on his quality of care, and about his lack of chart documentation on the two cases. Seasons stated that the charts did not contain adequate documentation of important pre- and post-surgical care, some of which was apparently the result of Wilkey's practice of writing notes in his own office files, rather than including the material in the hospital's chart. (See Exhibit R) The group then discussed the ongoing concerns about Wilkey's behavior, concerns Wilkey also disputed.

The MEC met again on March 5, 2003 to consider Wilkey's suspension. According to the minutes, the committee chair expressed three concerns for consideration: Wilkey's lack of honesty, his patient treatment issues, and his disruptive behavior. Since Seasons' opinion was subject to dispute, the committee believed it would not be fair to Wilkey to base a suspension on Seasons' opinion. The committee was concerned, however, about Wilkey's failure to fully document his cases, and about his honesty concerning his previous experience and the extent of his privileges at another nearby hospital. The MEC recommended that Wilkey's suspension be continued for 60 days to

permit additional investigation. (Exhibit S)  The hospital apparently conducted interviews with a number of surgical and operating room staff in March 2003, and Wilkey procured his own external physician reviews to refute Seasons' report.

The Ad Hoc Committee met on April 9.  They discounted the opinions of Wilkey's external reviewers, and noted that a similar lack of documentation described by Seasons existed in other charts for Wilkey's patients that the committee members had themselves reviewed.  (Exhibit V)  Wilkey met with the Ad Hoc Committee again on April 22.  The minutes of that meeting state that the majority of the discussion was about Wilkey's lack of proper documentation in hospital charts, and about his inappropriate conduct with staff.  Wilkey was aware of the fact that the hospital was obtaining a second external review from a Dr. Ricciardi; Wilkey was given a copy of Ricciardi's resume and told that his report was not yet complete.  Wilkey also presented his own experts' reviews to the Ad Hoc committee.  (Exhibit U) On April 29, the hospital sent Wilkey's office notes to Dr. Ricciardi. (Exhibit W)

On April 30, the Ad Hoc Committee made its final recommendation to the MEC, that Wilkey's privileges should be revoked.  (Exhibit Y)  Their written recommendation states that Dr. Ricciardi's report is not finished, but the committee believed it did not need that report in order to recommend

revocation. The committee's own review of several of Wilkey's charts found the same lack of proper documentation that Seasons noted. Wilkey apparently believed it was permissible for him to record information in his office chart, and he disagreed with the hospital's charting policies.

The MEC met the same day (April 30) to review the Ad Hoc Committee's recommendation. Wilkey was present at this meeting with his lawyer. He specifically asked about Ricciardi's report, and was informed that it was not finished. The MEC minutes state that Wilkey's patient care techniques and inadequate documentation are of concern, but that the MEC considered Wilkey's behavior to be unacceptable. The MEC voted to revoke Wilkey's privileges, and informed him that he was required to request an appeal hearing within 40 days. (Exhibits Z, 4/30/03 Minutes, and Exhibit X, letter to Wilkey.)

Just before the April 30 meeting, attorney Greg Hull was retained to represent the MEC. Hull did not attend the April 30 meeting, but soon thereafter was actively involved in Wilkey's internal appeal of his suspension and of the recommended revocation.

It is fair to say that Wilkey and the hospital sharply disagreed about the hospital's reasons for suspending and then revoking Wilkey's privileges. Wilkey alleged that a competitor on the staff wanted him fired, and that the hospital resented his

complaints about outdated operating room equipment and about improvements which had been promised but not performed, allegedly due to the hospital's budget problems. There were disagreements between the parties and their respective attorneys about scheduling hearings, the evidence that would be used at those hearings, and about the composition of the hearing panels. The record reflects that Wilkey's attorneys (primarily David Andrews) frequently talked and corresponded with Hull concerning these and other disagreements between their respective clients.

For instance, Wilkey demanded that a separate appeal hearing be held on the hospital's suspension decision. Only when that process was final would Wilkey agree to a second, separate hearing on the hospital's revocation decision. The hospital agreed to conduct two separate hearings, but would not agree to permit Wilkey to exhaust his internal appeal rights before considering his appeal of the revocation. (The final arbiter of such decisions is the hospital's Board of Directors.) Wilkey also insisted that the evidence for the suspension hearings be limited to that available to the MEC at the time the decision was made. Hearings on the suspension were finally held in September 2003, and the decision was apparently upheld by the hearing panel.

On November 20, 2003, Wilkey's attorney Andrew wrote to Hull in response to Hull's request for dates for the revocation

hearing.  In the letter, Wilkey objects to the chosen dates and
to the composition of the hearing panel.  He also requests the
hospital to produce a list of the evidence that was used by the
Ad Hoc Committee and by the MEC in reaching their decisions,
including the identification of the charts that were sent to Dr.
Ricciardi, along with his report and any correspondence with him.
Wilkey also asked the hospital to identify staff members who had
been interviewed, and for copies of transcripts of those
interviews.  (Exhibit EEE)  Hull responded on November 21
rejecting most of Wilkey's requests.  Regarding the charts sent
to Dr. Ricciardi, Hull states that Wilkey has had copies of those
charts for several months, as they were sent to his own external
reviewers.  Hull also stated: "However, as you well know, the
(MEC)'s decision to recommend revocation of Dr. Wilkey's medical
staff privileges and membership was not based upon those five
cases, anyway." (Exhibit P)

    In the meantime, the Board of Directors considered Wilkey's
appeal of his suspension.  The record is not entirely clear about
the result.  Wilkey alleged in a complaint filed in state court
(which is discussed more fully below) that a Board Committee
recommended that the suspension hearing be re-convened to allow
Dr. Wilkey to present evidence and to examine witnesses who made

negative statements about him.  (Exhibit FFFF at §20).[3]  In any event, the MEC was proceeding with the revocation appeal hearing, which was scheduled for March 8, 2004.  A hearing referee, local attorney Patrick Garrettson, was appointed to preside over this hearing as he had over the suspension hearings.  A few days before the hearing, Wilkey filed a complaint in state court, seeking an injunction to postpone the hearing.  His pleadings cite the November 2003 exchange of letters between Andrew and Hull, and allege that both the hospital "and its counsel" refused to provide him with the requested evidence.  (Exhibit FFFF, Verified Complaint, and Exhibit DDDD, Memorandum in Support of Temporary Restraining Order.)  The state court denied a TRO, but in a written entry (apparently filed on May 6, 2004) ordered that Wilkey must be provided with the opportunity to present his own witnesses and evidence in any revocation appeal hearing. (Exhibit RRRR)

That hearing began on March 15 (Exhibit JJJJ contains transcript excerpts), and another session was set by agreement for April 19.  However, after the hospital refused his attempt to resolve the dispute, Wilkey submitted his written resignation letter on April 16, 2004, in order to pursue a fellowship position at a hospital in another state.  His resignation ended

_____

[3] The Court cannot locate in the record any document from the Board of Directors concerning Wilkey's appeal.

-8-

the revocation appeal proceedings.

The hospital subsequently sued Wilkey in state court, alleging he breached a professional services contract the parties entered into when Wilkey first joined the hospital staff in 2001. A short time later, Wilkey filed an action in this district court against the hospital and twelve physicians who had participated in the peer review process, raising a variety of claims based upon the adverse actions taken against him. That case proceeded to a jury trial, and was resolved by the parties prior to verdict. (<u>Wilkey v. McCullough-Hyde Memorial Hospital, et al</u>, Case No. 1:04-cv-768 (MRB).) There were other lawsuits between the hospital and Wilkey, including one filed by his wife, and Wilkey filed a bankruptcy petition. All of these other disputes were apparently resolved by the settlement entered in the federal case.

<u>The Genesis of This Action</u>

During discovery in his federal case against the hospital, Wilkey took the deposition of Dawn Pfohl, the hospital's risk manager and Director of Quality Improvement. Pfohl testified that attorney Hull was responsible for compiling the exhibit books used by the MEC during the hearings. Those exhibit books did not contain Dr. Ricciardi's May 2003 report. That report concluded that Wilkey practices good surgery overall, and noted a few criticisms in two of the reviewed cases. Dr. Ricciardi, like

Dr. Seasons, stated that Wilkey's charts were inadequately documented. After he received Wilkey's office notes, he issued a supplement stating that if Wilkey had included that information in the hospital charts, it would have "probably negated the need to have had the cases evaluated externally." (Exhibit EE, at SW06209) Wilkey contends that Pfohl's testimony was his first knowledge that Hull was involved in the allegedly fraudulent concealment of Dr. Ricciardi's report. Wilkey moved to amend his complaint in the hospital case in October 2006, to add Hull and his law firm (Millikin & Fitton) as defendants, a motion that was denied by that court. Wilkey then filed this separate action on March 1, 2007.

Defendants moved to dismiss all of Wilkey's claims, which the Court denied in part in its December 28, 2007 Order. (Doc. 17) Wilkey's claims for negligence and fraud that survived the motion to dismiss are premised on his essential allegation that Hull knew about Dr. Ricciardi's favorable report, but fraudulently and with malice refused to disclose that report to Wilkey, and to include the report as a hearing exhibit.

Defendants' summary judgment motion argues that Wilkey's claims are properly considered as a claim for legal malpractice. As such, the claim is barred by Ohio's statute of limitations, which requires suit to be filed within one year after the claim accrues, which Defendants argue is no later than the date Wilkey

filed his federal action against the hospital defendants.

Defendants also argue that, even if the claim is timely, Wilkey cannot establish that Defendants acted with "malice" such that Wilkey can maintain a malpractice claim against Hull and his firm, attorneys for an adverse party. They contend that Wilkey cannot establish a common law fraud claim, that they are immune under federal and state laws concerning medical peer review proceedings, and that they were released by the settlement entered in Wilkey's prior hospital action. Wilkey takes issue with all of Defendants' arguments on a variety of grounds.

**DISCUSSION**

1. <u>Standard of Review</u>.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253 (1968)).

The Court is not duty bound to search the entire record in

an effort to establish a lack of material facts.  <u>Guarino v.</u>
<u>Brookfield Township Trs.</u>, 980 F.2d 399, 404 (6th Cir. 1992);
<u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir.
1989), <u>cert. den.</u>, <u>Superior Roll Forming Co. v. InterRoyal Corp.</u>,
494 U.S. 1091 (1990).  Rather, the burden is on the non-moving
party to "present affirmative evidence to defeat a properly
supported motion for summary judgment...," <u>Street v. J.C.</u>
<u>Bradford & Co.</u>, 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to
designate specific facts in dispute.  <u>Anderson</u>, 477 U.S. at 250.
The non-moving party "must do more than simply show that there is
some metaphysical doubt as to the material facts." <u>Matsushita</u>
<u>Electric Industries Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586
(1986).  The court construes the evidence presented in the light
most favorable to the non-movant and draws all justifiable
inferences in the non-movant's favor.  <u>United States v. Diebold</u>
<u>Inc.</u>, 369 U.S. 654, 655 (1962).

     The court's function is not to weigh the evidence and
determine the truth of the matter, but to determine whether there
is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  The
court must assess "whether there is the need for trial — whether,
in other words, there are any genuine factual issues that
properly can be resolved only by a finder of fact because they
may reasonably be resolved in favor of either party." <u>Id</u>. at
250.  "If the evidence is merely colorable, . . . , or is not

significantly probative, . . . , the court may grant judgment."
Anderson, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted).

2. Wilkey's Claims for Fraud and Negligence Are Properly Considered as a Claim for Legal Malpractice.

A malpractice claim is one that arises from a lawyer's professional services. "Malpractice by any other name still constitutes malpractice." Muir v. Hadler Real Estate Management Co., 4 Ohio App.3d 89, 90 (1982). This is true no matter how a plaintiff labels his claim, or whether a claim sounds in contract, tort or indemnity. Id., citing Gillett v. Tucker, 67 Ohio St. 106, 65 N.E. 865 (1902). As one Ohio appellate court noted, "Clothing a malpractice action in the language of fraud does not convert the action into one based on fraud." Dingus v. Kirwan, 2006 Ohio 4295 at ¶10, 2006 Ohio App. LEXIS 4214 (6th Dist. App. 2006). The "gist of the complaint" determines what

-13-

the claim actually is, and the appropriate statute of limitation that applies.  <u>Hibbett v. Cincinnati</u>, 4 Ohio App.3d 128, Syllabus ¶1 (1982).

Wilkey contends that Hull's liability to him is premised on his fraudulent refusal (or his negligent failure) to disclose Dr. Ricciardi's report.  Hull testified in deposition and in the prior hospital trial that he was not involved in the hospital's decision to request that report, a fact Wilkey does not dispute. Hull also testified that he had not seen the entire report during the underlying proceedings, although he readily admitted that Dawn Pfohl told him the hospital had received it.  Hull believed the report was not relevant to the hearings, because Wilkey insisted that the hearings be limited to evidence actually considered by the committees in reaching their decisions.  As noted above, the Ad Hoc Committee minutes of April 22, 2003 reflect that committee's major discussion was Wilkey's lack of chart documentation and his inappropriate conduct, not criticism of Wilkey's surgical practices or choices.

It is also beyond dispute that Wilkey knew then that Dr. Ricciardi was reviewing his charts, and that the Committee had not seen his report.  Furthermore, the Ad Hoc Committee concluded it did not even need Dr. Ricciardi's report to reach its conclusion to recommend revocation.  Similarly, the MEC did not have the report by the time it made its revocation decision on

-14-

April 30, 2003, and could not have considered or relied on it.

Hull's failure to read the report, to not disclose it to Wilkey, or to include it in the hearing exhibits books, may have been wrong or ill advised. Even if it was a questionable decision, it was a decision made within the scope of Hull's professional representation of his client. In the Court's view, Wilkey's claims against Hull are based upon facts that constitute allegations of legal malpractice.

It is of course an unfortunate fact that attorneys may engage in fraudulent or tortious conduct, and they are not immune from such claims simply because they are attorneys. See, e.g., Divine Tower International Corp. v. Kegler, Brown, Hill & Ritter Co., 2007 U.S. Dist. LEXIS 65078 (S.D. Ohio, September 4, 2007), holding that fraud claims against attorneys based upon intentional overbilling of a client survived a motion to dismiss. The district court noted that the claim was premised on ordinary business dealings, billing for services rendered, and not out of the exercise of an attorney's professional judgment during the course of representing a client. A similar result was reached in Baker v. Dorfman, 239 F.3d 415 (2d Cir. 2000), affirming a jury verdict against an attorney who rather breathtakingly misrepresented his credentials and his prior experience, in order to induce the plaintiff to hire him to prosecute a somewhat novel and difficult claim. The attorney conceded that he failed to

timely file and pursue his client's claim, but argued that the
fraud claim should have been dismissed.  The court of appeals
affirmed the client's recovery on a fraudulent inducement claim
premised upon the attorney's utterly false representations about
his experience and education.

In contrast, independent tort claims do not arise from the
rendition of legal services.  In <u>Endicott v. Johrendt</u>, 2000 Ohio
App. LEXIS 2697 (10th Dist. App., June 22, 2000), a client
brought fraud and misrepresentation claims against her former
attorneys, alleging they pressured her to accept an unreasonably
low settlement offer in her employment case.  When she refused
the offer, the attorneys withdrew from the case shortly before
trial.  The court of appeals affirmed a summary judgment in favor
of the attorneys, rejecting arguments that they pressured the
client to settle in order to maximize their contingent fee
recovery, or because they wanted to remain on good footing with
opposing counsel.  These were insufficient to support a claim of
fraud separate from the client's malpractice claim.

Similarly, in <u>Gullatte v. Rion</u>, 145 Ohio App.3d 620, 763
N.E.2d 1215 (2000), a client alleged fraud against his former
criminal defense attorney, contending the attorney told him to
plead guilty because he would be eligible for shock probation and
released in four years.  In reality, an Ohio statute rendered him
ineligible for that benefit, something the defense attorney

-16-

either knew or clearly should have known.  When the client was later released from prison, he sued his attorney alleging the attorney fraudulently promised him he would get probation.  While the appellate court did not condone the attorney's conduct, it held the client's claim was one for legal malpractice and not fraud, noting that "When alleged fraudulent conduct is integral to a malpractice claim, the conduct does not independently extend the statute of limitations for malpractice."  Id. at 626.

Here, the Court can find no evidence in the record establishing or raising a reasonable inference that Hull's actions or inactions were anything other than decisions made occurring during his professional representation of his client. Wilkey has repeatedly accused Hull of fraud and malicious intent, testifying that Hull "buried" Dr. Ricciardi's report because Hull knew the report "would blow any proceedings that [the hospital staff] were taking against me out of the water, and he deep-sixed it." (Doc. 64, Wilkey Deposition p. 13)  Wilkey asserts that Hull had a "duty to be fair" to him, because the hospital bylaws require fairness to members of the medical staff.  And if Wilkey "asks for a piece of paper to be delivered that I know is out there and it's probably favorable to me and he doesn't provide it, he's guilty of malpractice.  He did not treat me fairly. That's what this is about. ... Hull knows it." (Id., p. 16) Even assuming that Hull breached such a duty, an attorney's

-17-

violation of a lawyer's ethical or disciplinary rule that may impose such a duty does not give rise to a private right of action.  <u>American Express Travel Related Serv. Co. v. Mandilakis</u>, 111 Ohio App.3d 160, 675 N.E.2d 1279 (1996).  And an alleged breach of a hospital's bylaws by an attorney during peer review proceedings similarly cannot support a private tort claim.

The Court finds that Wilkey's claims are properly construed within the rubric of legal malpractice, and rejects Wilkey's arguments to the contrary.

3.    <u>Third-Party Claims Against Attorneys</u>

Ohio law is clear that an attorney is generally immune from malpractice or professional negligence claims brought by third parties.  Exceptions to that immunity are recognized if (1) the third party was in privity with the attorney's client when the attorney's services were rendered, or (2) the attorney acts "maliciously."  <u>Scholler v. Scholler</u>, 10 Ohio St.3d 98, 462 N.E.2d 158 (1984).  <u>Scholler</u> addressed the privity exception, and concluded that privity did not exist between a mother and her child, barring the child from bringing a malpractice action against the mother's attorney stemming from his representation during a previous child support proceeding.

In considering Defendants' motion to dismiss, this Court noted that Wilkey and the MEC were not in privity, but were adverse parties to the peer review process.  The Court rejected

Wilkey's suggestion that privity existed because the hospital and Wilkey had entered into a professional services contract. Wilkey now suggests that privity existed because the parties shared a "mutuality of interest" in the object of peer review proceedings, which is to improve patient care. He suggests that this overriding goal is shared by everyone involved in medicine. The laudable but amorphous goal of good patient care is not the sort of interest upon which privity is recognized. The Ohio Supreme Court recently reaffirmed the vitality of the privity bar to third party claims in Shoemaker v. Gindlesberger, 118 Ohio St.3d 226 (2008). There, the Supreme Court rejected arguments that intended but contingent beneficiaries of a decedent may bring an action against the attorney for the decedent, due to a lack of privity. This is the case even though the beneficiaries are the ones who are ultimately harmed by an attorney's negligence in estate planning or will drafting, thus failing to carry out the decedent's intent.

The Court therefore concludes that Wilkey and the hospital and the members of the various hospital committees were not in privity, such that Wilkey could proceed against the hospital's attorneys on that basis.

The contours of the malice exception for attorney immunity to third party claims are not brightly drawn. In Simon v. Zipperstein, 32 Ohio St.3d 74, 76-77, 512 N.E.2d 636 (1987), the

-19-

Ohio Supreme Court suggested that an attorney acts maliciously if he acts with intent to defraud a third party, or with "malice" or "bad faith," but did not amplify those terms. And in DiPaolo v. DeVictor, 51 Ohio App.3d 166, 555 N.E.2d 969 (1988), the court of appeals affirmed the dismissal of a complaint by estate beneficiaries against the attorney for the executrix. The beneficiaries alleged that the attorney fraudulently induced the executrix to release the estate's interest in a company apparently owned by the deceased and another relative, a company the lawyer had also represented. The beneficiaries alleged they discovered the attorney's fraud only years after the estate was formally closed. The beneficiaries were not in privity with the executrix, and could only proceed if they established malice. The court held that, in order to sufficiently allege a fraud claim, "plaintiffs must have specifically alleged that defendants committed the actions for their own personal gain. To hold otherwise would be to undermine the purpose and focus of the malpractice statute." Id. at 976. These cases reflect the definition adopted by Ohio law of "actual malice" for punitive damages purposes: "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Preston v. Murty, 32 Ohio St.3d 334, 336, 512

-20-

N.E.2d 1174 (1987).

More recently, in <u>LeRoy v. Allen, Yurasek & Merklin</u>, 114
Ohio St.3d 323, 872 N.E.2d 254, the Supreme Court held that a
plaintiff's allegations of an attorney's collusion and conflict
of interest were sufficient to defeat dismissal of a claim under
Rule 12(b)(6).  But the court's ruling relied on its observation
that since malice may be pled generally, the plaintiff's
allegations did not trigger the heightened pleading requirements
of Rule 9(b).  This Court previously denied Defendants' motion to
dismiss on similar grounds.

Now, however, Defendants have sought summary judgment, and
the question is whether Wilkey's evidence raises a genuine
disputed factual issue under Rule 56.  The few cases that
substantively address the issue of "malice" at the summary
judgment or trial stage demonstrate that Ohio law requires
something more than the record reflects here, in order to
establish "malice" for third-party claims.

In <u>Ryan v. Wright</u>, 2007 Ohio 942, 2007 Ohio App. LEXIS 1888
(10th Dist. App., March 6, 2007), the court of appeals affirmed
summary judgment in favor of an attorney who prepared a
testator's will, devising a valuable piece of property to the
plaintiff Ryan.  Before the will was executed, the testator's
health had declined and he was living in a nursing home.  He had
days on which he was not lucid, leading the attorney to arrange a

competency exam for his client.  However, before the exam was

performed, the nursing home staff called the attorney and

reported that the client was "lucid that day."  The attorney went

to see his client, spoke to him, and then had him execute his

will.  Three days later, the competency exam found that the

testator was incompetent.  Without telling anyone, the attorney

wrote "VOID" on each page of the recently-executed will.  The

testator died a short time later, and a will contest ensued

between the testator's heirs and Ryan.  After settling that case,

Ryan sued the attorney, contending he was in privity with the

testator, and that the attorney acted maliciously with intent to

defraud him out of inheriting the property by intentionally

defacing the executed will.  The court first found that Ryan

lacked privity with the attorney, as his interest in the property

had not vested at the time the attorney voided the will.

Regarding malice, the court cited abuse of process and malicious

cases to note that malice includes "actions taken by the attorney

with an ulterior motive separate and apart from the good-faith

representation of the client's interests."  The court also

referenced the Black's Law Dictionary definition, "a condition of

mind which prompts a person to do a wrongful act willfully, that

is, on purpose, to the injury of another without justification or

excuse."  Id. at ¶19, internal citations omitted.  The court

concluded that the evidence at best suggested the attorney acted

to protect himself from a potential claim, and not out of an intent to injure Ryan by destroying the will.  The Ohio Supreme Court affirmed the court of appeals decision by citing <u>Shoemaker v. Gindlesberger</u> which, as discussed above, addressed only the privity exception and did not discuss malice.

In <u>McGuire v. Draper, Hollenbaugh & Briscoe Co., LPA</u>, 2002 Ohio 6170 (4th Dist. App. 2002), the plaintiff sued his former attorneys and an attorney retained to represent their interests in defending plaintiff's anticipated malpractice claim. Plaintiff argued the second attorney acted with malice towards him by violating several ethical rules, and by refusing to return his file.  The court of appeals affirmed the trial court's summary judgment to the second attorney, and rejected plaintiff's argument that the attorney's interest in protecting the lawyers so diverged from plaintiff's interest that a question of fact existed on whether the attorney acted with malice.  The court also held that ethics violations do not demonstrate malice, and in any event plaintiff had no evidence of the attorney's intentional violation of any rule.

Applying all of these cases to the record in this case, the Court finds nothing to establish or even suggest that Hull acted to benefit himself, or that he acted to further his own economic or financial interests.  There is no evidence that he intentionally violated any ethical or disciplinary rule.  Hull

did not "hide" Dr. Ricciardi's report or its existence from the hospital and the committee members. While several of the members testified that if they had been provided the report they would have considered it along with all the other evidence, Pfohl testified that she told Dr. Knoedler, the chairman of the committee, that the report had been received. (See Doc. 30, Exhibit 6 at pp. 22-25) She also testified that several of the physicians involved with the hearings knew that Dr. Ricciardi was working on the report, as the minutes of the Ad Hoc Committee (Exhibit Y) specifically confirm.

Wilkey has not demonstrated that Hull "concealed" the existence of the report from Wilkey; Wilkey had listed Dr. Ricciardi as his own witness for the revocation hearing (Exhibit WWW), and Hull's letters consistently asserted that the MEC did not have Ricciardi's report when it recommended Wilkey's revocation. (See Exhibit ZZZ) There is no evidence that Hull ever told or suggested to Wilkey or his attorney that a report did not exist. And there are no facts that raise a reasonable inference that Hull harbored any "hatred, ill will or a spirit of revenge" towards Wilkey, or exhibited a "conscious disregard" for his rights.

Wilkey's accusation that Hull acted maliciously is not supported by anything other than his own *ipse dixit*. The Court therefore concludes that Wilkey has not established a genuine

issue of disputed fact as to whether Hull acted with "malice" or "bad faith" during his representation of the hospital committees.

Regarding Defendant Millikin & Fitton, the law firm of which Hull was a shareholder, Wilkey does not articulate an independent basis upon which the firm could be liable to him. Wilkey's opposition brief often refers to the "Defendants" but the substantial allegations are directed solely to Hull's conduct. Wilkey suggests that the law firm "must have known" of Hull's alleged concealment. He also cites testimony from the firm's managing director that Hull has recently been asked to leave the firm. Neither of these arguments is sufficient to establish a claim against the law firm.

The Court therefore concludes that Defendants are entitled to summary judgment on Wilkey's claims.

<u>Statute of Limitations</u>

Even assuming that Wilkey could establish a triable issue as to Defendant's liability, the Court also finds that Wilkey's claims were not timely filed.

Wilkey argues his claim accrued when he took the deposition of Dawn Pfohl in July 2006 during his prior hospital case. Wilkey argues that her testimony was his first knowledge of Hull's involvement with the undisclosed report from Dr. Ricciardi. The Court disagrees with Wilkey's argument.

Ohio Rev. Code 2305.11(A) provides that a legal malpractice

action must be commenced within one year after the cause of
action accrues.  The Ohio Supreme Court held that "... an action
for legal malpractice accrues and the statute of limitations
begins to run when there is a cognizable event whereby the client
discovers or should have discovered that his injury was related
to his attorney's act or non-act and the client is put on notice
of a need to pursue his possible remedies against the attorney,
or when the attorney-client relationship for that particular
transaction or undertaking terminates, whichever occurs later."
Smith v. Conley, 109 Ohio St.3d 141, 142, 846 N.E.2d 509 (2006),
quoting Zimmie v. Calfee, Halter & Griswold, 43 Ohio St.3d 54,
538 N.E.2d 398 (1989).

Smith v. Conley involved a malpractice claim stemming from
the attorney's representation of a criminal defendant.  The
Supreme Court concluded that the "cognizable event" triggering
the statute of limitations was the defendant's conviction.  And
in Gullatte v. Rion, supra, the Ohio Court of Appeals held the
cognizable event was the plaintiff's filing of a motion for
relief from judgment, based on his allegation that his trial
counsel intentionally informed him that he was eligible for
probation, in order to persuade him to plead guilty.  The court
concluded that by that date, plaintiff knew that he had been
injured, and was on notice that his attorney's negligence may
have caused that injury.

The Ohio Supreme Court has also held that a "cognizable event" is an event that imposes upon a plaintiff a duty to determine if his injury was caused by malpractice, and to identify the tortfeasors. Flowers v. Walker, 63 Ohio St.3d 546, 589 N.E.2d 1284 (1992). Flowers was a medical malpractice case, but it arose under the same statutory language at issue here.[4] Flowers had a routine checkup with her gynecologist who referred her for a mammogram, which was done on November 7, 1986. The gynecologist reported to her that the results were negative. Four months later, Flowers discovered a lump in her breast and returned to her gynecologist, who did not feel a lump and told her to come back in May. Again in May the gynecologist did not feel a lump and told Flowers that her November 1986 mammogram was normal. Concerned about the lump, Flowers went to her family doctor, who referred her to a surgeon; the surgeon ordered another mammogram and then performed a biopsy, which revealed breast cancer. Flowers had a lumpectomy on July 1, 1987, followed by treatment for the cancer.

Flowers consulted a lawyer in December 1987 about a claim against her gynecologist. Seven months later, the attorney's investigation revealed the name of the radiologist who interpreted her November 1986 mammogram. On March 9, 1989,

_____

[4] The medical malpractice statute of limitations was later amended, and is now codified at Ohio Rev. Code 2305.113.

within a year of discovering his identity, Flowers sued the radiologist for malpractice.

The radiologist argued the claim was untimely, and the Ohio Supreme Court agreed. The court found that the "cognizable event" that triggered the one-year statute was the date that Flowers had surgery for and discovered her breast cancer, on July 1, 1987. That event triggered Flowers' duty to investigate, something she actually did by retaining an attorney, who began an investigation. The court rejected Flowers' argument that the claims against the unknown radiologist did not accrue until she specifically discovered his name, noting that the cancer diagnosis imposed upon her a duty to discover the identity of the tortfeasors. The court noted that the "cognizable event" rule was adopted to put malpractice plaintiffs "on the same playing field" with other tort plaintiffs. Claim accrual will be delayed in instances where a plaintiff does not know she has been injured, or where an injury has occurred with no reason to suspect that it is connected to malpractice. But the "cognizable event" rule is not intended to accord malpractice claimants an advantage over other plaintiffs. Flowers knew by July 1, 1987 that she had cancer, and she knew that her November 1986 mammogram results were reportedly negative. This was sufficient to trigger a duty to investigate further. As she did not file suit against the radiologist within one year of that date, the

Supreme Court affirmed the trial court's order that her claim was untimely.

The result in <u>Flowers</u> applies here.  There is no doubt that Wilkey knew by November, 2003 that Hull had refused his attorney's request for any information about Dr. Ricciardi, including his report.  Wilkey had identified Ricciardi as his witness for the March 2004 hearings, but resigned rather than completing the appeals process.  And by November 12, 2004, Wilkey was undisputably aware of the nature and extent of his injury, as he filed an extensive complaint against the hospital and almost everyone who had been involved in the peer review proceedings.  Wilkey knew that Hull was actively involved in the peer review process.  The Court therefore finds that the latest date that Wilkey's claim against Hull and the law firm accrued is November 12, 2004.   He did not attempt to name Hull and the law firm in his prior case until October 2006, two years after he filed his lawsuit.  And this action was not filed until March 1, 2007.  The Court therefore concludes that the claim against the Defendants is untimely under Ohio Rev. Code 2305.11(A), and that Defendants are entitled to summary judgment on that basis as well.

<u>Other Defenses</u>

Defendants also contend they are immune from damages liability under federal and state statutes granting such immunity to participants in medical peer review proceedings.  See 42

U.S.C. §11111; Ohio Rev. Code 2305.251.  They argue that Wilkey released his claims against them in the settlement agreement entered in the previous case against the hospital defendants, and that Wilkey lacks admissible expert testimony to establish a malpractice claim.  Given the Court's conclusions discussed above, the Court will not address these arguments.

**CONCLUSION**

For all of the foregoing reasons, Defendants' motion for summary judgment is granted.  Plaintiff's complaint is hereby dismissed with prejudice.

THIS CASE IS CLOSED.

SO ORDERED.

DATED: February 3, 2009        s/Sandra S. Beckwith
                               Sandra S. Beckwith
                               Senior United States District Judge